UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10334-RWZ |
| | ) | |
| JEFFREY HOLLIDAY | ) | |

<u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Defendant Jeffrey Holliday respectfully submits this memorandum in aid of sentencing.

A.  <u>The Applicable Guideline</u>

On July 1, 2005, defendant pleaded guilty to three counts of embezzlement of United States funds, that from November 2000 to January 2002, while an employee of the U.S. Bureau of Prisons at Devens, he made sham purchases using government credit cards.

The guideline, based on loss over $70,000, is 14, less 2 for acceptance, resulting in an offense level 12.  In Criminal History I, the range is 10-16 months in Zone C.

The probation department added two points for abuse of a position of trust, invoking U.S.S.G. § 3B1.3, which increases a defendant's total offense level by two levels when "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  But defendant did not occupy a position of trust with regard to the credit card transactions.  His official title was "Maintenance Mechanic Supervisor," a

position with clearly defined responsibilities.  <u>See</u> description attached.  His responsibilities included "construction, repair, maintenance and inspection of all inside and outside housing units and buildings," as well as "direct[ing] subordinate supervisors responsible for a variety of trade practices such as: painting, plumbing, HVAC, caprentry, welding, masonry, general maintenance work, heating/air conditioning, pipefitting, and electrical."  The position did not involve supervision of credit card expenditures, which responsibility lay with the Facility Manager.  While Holliday knew that the Facility Manager was not attending to his responsibility to monitor credit purchases, Holliday's knowledge of the facility manager's lax practices did not convert his position into one "characterized by professional and managerial discretion" which is "subject to significantly less supervision" than other positions.  U.S.S.G. § 3B1.3 application note 1.  Certainly, Devens, a facility with well-defined job duties, did not misapprehend Holliday's job description, nor was it duped into believing that he bore the formal responsibility of fiscal control.

Defendant submits that the adjusted guideline is 10-16 months in Zone C.

Potential departures include § 5K2.13 for diminished capacity, where Holliday had diminished capacity to control behavior which he knew to be wrongful, gambling compulsion, and

the need to support his family.  See infra.

    B.   Booker Factors

In the wake of Booker, this court must impose a sentence which is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).  See United States v. Booker, 125 S.Ct. 738 (2005). In the course of fashioning this sentence the Court must consider all the factors enumerated at 18 U.S.C. § 3553(a)(1)-(7). Booker, at 764-65.  These factors under § 3553(a) play at least an equal role in federal sentencing.  Otherwise, the guidelines constitute a de facto mandatory scheme and the Sixth Amendment right vindicated in Booker is violated.  See, e.g., United States v. Hughes, 396 F.3d 374 (4th Cir. 2005) (sentencing court must consider relevant factors set forth in § 3553(a), as well as the prescribed guideline range, before imposing a sentence).

Further, under 18 U.S.C. § 3661, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

1.   History and Characteristics of the Defendant, § 3553(a)(1)

Holliday is 41 years old, born in Longwood, CA.  His early history is detailed in the report of Dr. Ronald Ebert, filed separately under seal.

At about age 24, Holliday began working for the Bureau of Prisons as a corrections officer. After two years, he became a maintenance mechanic, doing facilities work at FCI, Terminal Island, CA. His hard work earned the favorable attention of the warden. The degree of his absorption in the work was extraordinary and, for our purposes, revealing. As described in Dr. Ebert's report, one day during this period Holliday learned that his stepfather had been put on a respirator. Although clearly disturbed about having to make the decision to turn off the respirator, Holliday returned to work only two days later. Dr. Ebert notes that Holliday's focus on work was emerging as "intense and almost obsessive, to the point of not allowing himself to deal with significant life issues." As Holliday described it to Dr. Ebert, "The Bureau of Prisons became my life."

When the warden at Terminal Island was chosen to lead the soon-to-be-opened facility at Devens, Holliday went with him to open the facility, holding the position of "Maintenance Mechanic Supervisor" at the new Devens. He arrived with the strong support of the new warden, but met resistance from his immediate boss, the Facility Manager. Both the Facility Manager, and an Associate Warden who was his ally, favored a man who was listed in the pecking order as Chief of Utilities (in charge of the boiler, HVAC, and systems), who held a lesser wage grade. Both

wanted to move Holliday into the lesser Chief of Utilities position, with responsibilities for the powerhouse systems about which Holliday knew nothing.  Holliday sought the help of the warden who intervened on his behalf.

As work tensions increased, Holliday, who had begun gambling at about age 26 with small amounts, now increasingly turned to sports gambling as a distraction.  He was introduced by a neighbor to a local bookie who took sport wagers.  Holliday increased his focus on sports, researching the minutia of team injury reports and so forth, all to deflect personal stresses of work and home.  He said that the gambling, at the time, did not affect his job performance, but that the job pressures were not helping his marriage.  His marriage had been breaking down and counselling had not worked.

In September 2000, the Devens warden announced he was leaving to take a BOP assignment in California.  In October, the Facility Manager called Holliday into his office and said "you're Daddy is gone, and you're gone too."  As Holliday put it, his whole world crashed in on him.  Holliday sought the intercession of the former warden, driving to his home to plead for his job.  The former warden begged off, saying he was not warden at Devens any longer.

Holliday, at the time experiencing deep humiliation coupled with financial difficulties occasioned by the increase in his

gambling, set up the first credit card theft.  He at first intended to return the money, but a combination of anger and increased financial pressure as he tried to gamble his way out of trouble resulted in increased thefts.

Dr. Ebert administered psychological tests to Holliday, noting that the results were "significant for his frank and open manner and willingness to present himself honestly."  Holliday is "preoccupied with feeling guilty and unworthy and . . . feels that he deserves to be punished for the wrongs he had committed." Report at 5.  Overall, Dr. Ebert reports:

> Jeffrey Holliday is a man who used his work as a means not only to establish a sense of self-esteem, but to avoid having to deal with difficult life issues such as marital stress and personal loss and consequent depression.  He describes his devotion to the Federal Bureau of Prisons in emotional, almost romantic terms, indicating the strength of his commitment and the positive value he gained from his job.  He began to develop a gambling habit, apparently in connection with his disintegating marriage and increased pressures at home.  As work pressures began to increase, ultimately leading to a forced demotion, signs of depression and anger increased, leading first to increased gambling and finally to the embezzlement scheme.

Report at 6.

> 2.  The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  (§ 3553(a)(2)(A).

The guidelines here are in Zone C, reflecting the judgment of the Sentencing Commission about the modest seriousness of the offenses here.

    3.    The need for the sentence "to protect the public from further crimes of the defendant" (§ 3553(a)(2)( C).

Holliday is unlikely to engage in any further crimes. There is no suggestion in the PSR or in the record that he poses any danger to the community.

    4.    The "kinds of sentence and sentencing range" established under the Guidelines and "any pertinent policy statement"(§ 3553(a)(4) & (5).

Under § 3553(a)(4), the Court must consider the applicable guideline range, including whether a departure from the range is applicable in this case, and if so to what extent, before continuing with its analysis under 18 U.S.C. § 3553(a). See United States v. Jones, 352 F.Supp.2d 22 (D.Me. January 21, 2005) (Hornby, J.).

The applicable guideline is 10-16 months in Zone C. Grounds for departure include gambling compulsion and diminished capacity under § 5K2.13. Holliday was a workaholic, a dutiful employee utterly devoted to the BOP, who had his self-esteem staked on his standing in the workplace. When that position was jeopardized, he fell into depression, leading to increased gambling and to embezzlement. In Dr. Ebert's view, Holliday's gambling "reached the level of a compulsion as a consequence of work and family stressors. As his financial pressures mounted, this depression increased and his judgment became increasingly clouded, resulting in quite aberrant conduct for this previously devoted employee." Report at 6.

Dr. Ebert points to major depression, recurrent and severe, with the trigger being his workplace troubles. Currently, he says that Holliday's depression "has reached a very serious stage, with the possibility of self destructive behaviors including suicide. This indicates a need for intensive immediate treatment." Report at 6.

Gambling compulsion has provided a ground for sentence reduction. (The guideline provision stating that "Addiction to gambling is not a reason for a downward departure," USSG 5H1.4, was added by an amendment effective November 1, 2003, well after the conduct here.) A pertinent case is <u>United States v. [name withheld]</u>, Docket 99-10370-MLW (D. Mass. April 21, 2000). There, on a charge of embezzlement by a bank employee, Judge Wolf departed from a guideline range of 12-18 months to a sentence of Probation, saying:

> this offense was truly aberrant behavior, resulting in part from diminished capacity in the form of a gambling addiction and a probationary sentence was warranted.

Also on point is <u>United States v. Harrison</u>, Docket No. 88-00257-JLT, on a charge of bank embezzlement with a guideline of 10-16 months, Judge Tauro imposed 36 months probation, saying:

> In this case, the defendant had been convicted of Bank Embezzlement. He had worked for the bank for about nine years and had been regarded by his supervisors as an excellent and trusted employee. During the last year of this employment, influenced by his gambling compulsion, he committed the instant offense. This compulsion clouded his judgement to such an extent that

-8-

it could be regarded as one of the extraordinary circumstances where mental and emotional conditions are sufficiently relevant to justify a downward departure. (5H1.3)

Important additional factors include:

a.  Holliday lives with his fiancée, Kelly Haynes.  They met at Devens where she is a corrections officer.  Her position is at risk now that Holliday stands convicted of stealing from the BOP and faces possible custody in some BOP facility.  If he is committed, she will likely be forced to choose between him and her job (and, with it, her ability to finance her house and care for her kids).

b. There is the significant risk that Holliday, as a former BOP employee familiar with facility security systems, would face custody in the highest levels of BOP or in far quadrant of the gulag reserved for security risks, making a committed sentence considerably more severe.

c.  Holliday has family responsibilities.  He cares for his daughter every other weekend and provides child support.  His former wife has expressed worry that she and her daughter will suffer financially if he is unable to make child support payments.  PSR, ¶ 61.  Formerly, under <u>Pereira</u>, the standard for this departure was high.  <u>United States v. Pereira</u>, 272 F.3d 76, 82 (1st Cir. 2001); <u>United States v. Roselli</u>, 366 F.3d 58 (1st Cir. 2004).  However, post-<u>Booker</u>, a court need not forego imposing a reduced sentence where a defendant is not the lone

caretaker. In <u>United States v. Antonakopoulos</u>, 399 F.3d 68 (1st Cir. 2005), the trial court had denied a downward departure where other persons could be found to provide help.  The <u>Antonakopoulos</u> court, ruling in the wake of <u>Booker</u>, stated that "[t]his ground, that of family circumstances, is still open and is not frivolous." <u>Id</u>.  <u>See also</u> <u>United States v. Caccavaro</u>, No. 00-10166 (D.Mass. August 3, 2001) (Woodlock, J.) (departure from 24-30 month range to probation with 24 months home confinement); <u>United States v. Janell Dansby</u>, Criminal No. 03-10066-DPW ("Unusually significant and demanding family responsibilities, U.S.S.G. § 5H1.6, demonstrated and made even more salient during the defendant's commendable and substantial efforts and accomplishment in pre-sentence rehabilitation."); <u>United States v. Sickinger</u>, Criminal No. 95-10062 (D.Mass. March 11, 1996) (Keeton, J.) (departure from 27-33 month range to probation with 12 months home confinement); <u>United States v. Taylor</u>, Criminal No. 96-10337 (D.Mass. June 17, 1999) (Keeton, J.) (departure from 24-30 month range to probation with 6 months home confinement); <u>United States v. Santinello</u>, Criminal No. 97-30007 (D.Mass. June 22, 1999) (Ponsor, J.)(departure from 24-30 month range to probation with 12 months home confinement); <u>United States v. Parry</u>, Criminal No. 01-40020 (D.Mass. October 9, 2001) (Gorton, J.) (departure from 27-33 month range to probation with 6 months community confinement and 9 months home confinement); <u>United States v. Allen</u>, Criminal No. 01-10065 (D.Mass. May 16, 2002)

(Stearns, J.) (departure from 21-27 month range to 6 months home confinement as condition of supervised release); United States v. Webb, Criminal No. 02-10024 (D.Mass. January 17, 2003)(Wolf, J.) (departure from 10-16 month range to probation with four months home confinement).

 Finally, in Dr. Evert's view, Holliday's "emotional state is dependent upon his ability to continue in his roles as caretaker [and] father," making it critical that he be able to provide financial and emotional support for his dependents.  This would minimize the risk of self destructive behavior about which Dr. Ebert expresses considerable concern.

         JEFFREY HOLLIDAY
         By his attorney,

         /s/ Charles P. McGinty

         Charles P. McGinty
          B.B.O. #333480
         Federal Defender Office
         408 Atlantic Avenue, 3rd Floor
         Boston, MA  02110
         Tel: 617-223-8061

October 25, 2005