UNITED STATES DISTRICT COUR
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | CRIMINAL NO. 04-10334 RWZ |
| v. | ) ) |  |
| JEFFREY HOLLIDAY, | ) ) |  |
| defendant. | ) ) |  |

UNITED STATES' RESPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM

The United States, by its undersigned counsel, responds as follows to issues raised in Defendant's Sentencing Memorandum.

1. <u>The Presentence Report Correctly Applies An Enhancement Based upon Holliday's Abuse of His Position of Trust.</u>

In his Sentencing Memorandum, Holliday argues – with respect to the calculation of the United States Sentencing Guidelines – that there should be no adjustment for abuse of a position of trust. In framing this argument, Holliday characterizes his job responsibilities narrowly and asserts that his "position did not involve supervision of credit card expenditures" and that he did not bear "the formal responsibility of fiscal control." Defendant's Sentencing Memorandum at 2. Holliday acknowledges, however, that he "knew that the Facility Manager was not attending to his responsibility to monitor credit purchases." <u>Id.</u> Nor does he dispute that, "[a]s a rule, Holliday took responsibility for collecting and reconciling the credit card statements for his subordinates." PSR ¶9.

Holliday's argument misses the point. For the most part, Holliday's abuse of his position of trust does not arise from any <u>accounting</u> responsibilities he may have shouldered (although his practice of reconciling the credit card statements of his subordinates did facilitate the scheme).

Rather, the fraud scheme grew out of Holliday's position of trust and his managerial discretion in planning work and ordering materials for construction and maintenance projects. As the person who was effectively in charge of procurement for outside construction and maintenance at Devens FMC, Holliday was in a position to, and did, abuse that responsibility. As set forth in Holliday's formal job description, among other duties, the General Foreman:

> . . . is responsible for the remodeling, alteration, repair and maintenance of all housing units and buildings located on the institution grounds.
>
> ***
>
> [he also] Plans work and orders materials for in-house construction and maintenance projects, formulates specifications and purchases for contractual work, determines manpower and skill level requirements needed to accomplish work required.

Position Description, Maintenance Mechanic Supervisor WS-4749-14 (Attachment A to Defendant's Sentencing Memorandum.

Because Holliday was entrusted with responsibility for deciding what goods and services were needed and for deciding where to buy them, he was able to perpetrate and conceal the fraud at issue in this case. At Holliday's direction, the FMC Devens "bought" approximately $110,000 worth of such items as control switches, metal brackets and the like. Holliday alone was in a position to know that these items were not really needed that, indeed, they were non-existent.

It was precisely because of the discretion Holliday exercised in deciding what items to buy, at what price, and from whom, that his approval of $110,000 in expenditures for non-existent goods went unchallenged. In Holliday's own words, "To cover the charges I made on the government credit cards I made up false invoices and credit card purchases form[s] on my government computer. I placed them in to the purchase files. I stopped this activity when the

2

procurement duties were assigned back to the facility manager." Affidavit, June 2, 2004. (Attached as Exhibit A).

The paperwork generated in the course of the scheme reflects that Holliday was in a position to "sign off" as approving purchases that were purportedly made by his subordinates. See, e.g., Federal Bureau of Prisons, FMC Devens, Credit Card Purchase Forms, 1/8/01 (Marine Sheetmetal); Federal Bureau of Prisons, FMC Devens, Credit Card Purchase Forms, 3/15/01 (Digatron); Federal Bureau of Prisons, FMC Devens, Credit Card Purchase Forms, 4/9/01 (Digatron) [All attached as Exhibit B]. Although he was not the ultimate contracting authority, it was this trust and discretion – as the person responsible for procurement of materials and supplies – that Holliday abused in executing the scheme. Holliday's role as a supervisor, moreover, provided him the opportunity (as well as the trust) whereby he could use the credit cards assigned to those who worked under his direction in order to complete sham purchases.[1]

U.S.S.G. Section 3B.13 enhances a defendant's base offense level by two levels if the defendant "(1) occupied a position of trust vis-a-vis [his] employer; and (2) utilized this position of trust to facilitate or conceal [his] offense." See, e.g., United States v. Reccko, 151 F.3d 29, 31 (1st Cir.1998); United States v. Gill, 99 F.3d 484, 489 (1st Cir.1996).

In United States v. Chanthaseng, 274 F.3d 586 (1st Cir. 2001), the First Circuit reiterated its observation that "a 'position of trust,' for the purposes of section 3B1.3, is 'characterized by

---

[1] Holliday's role as a supervisor of other employees was critical to his execution and concealment of his embezzlement scheme. Indeed Holliday used subordinates' credit cards because – during part of the relevant period – his own credit card privileges had been suspended due to accounting irregularities. All of the cards (other than Holliday's own) that were used in the scheme were held by individuals under Holliday's direct supervision; Sean Reidy (card no. **** **** **** 6963); Eric Loughby (card no. **** **** **** 6336); Edward Toner (card no. **** **** **** 6328); Timothy Shea (card no. **** **** **** 4533); John Brosnahan (card no. **** **** **** 7314); John Cote (card no. **** **** **** 8869); Jeff Schluter (card no. **** **** **** 4250); Shawm Flaminio (card no. **** **** **** 7264).

professional or managerial discretion.'" 274 F.3d at 589 (citing United States v. O'Connell, 252 F.3d 524, 528 (1st Cir.2001), and Reccko, 151 F.3d at 31). The Chanthaseng decision makes clear, however, that the title of defendant's position is not controlling; the test is a functional one. "[T]he relevant inquiry in cases such as this one is whether a person in fact occupied a position of trust, rather than whether the person's title or official job description contained a discretionary element." Chanthaseng, 274 F.3d at 589.

That Holliday was able act without direct supervision – even if some of the acts by which he perpetrated his fraud were outside his official job duties – supports the finding that he occupied a position of trust. Cf. Chanthaseng, 274 F.3d at 589 (noting, "[a]lthough it was against bank regulations for appellant to countersign rapid deposit tickets at will, the bank manager's laxity effectively made that a central element of her position.").

2. Defendant's Gambling Addiction Does Not Significantly Diminish His Culpability.

The United States Sentencing Guidelines now make clear that a gambling addiction is not a ground for a departure. See U.S.S.G. §5H1.4. It is true, as defendant notes, that this section was not added to the guidelines until after the completion of Mr. Holliday's offenses. But the amendment does not reflect any change in the pre-existing law. While Holliday cites unreported cases in which judges of this Court have considered defendants' gambling addictions in weighing whether extraordinary circumstances existed that could warrant a downward departure, the reported case law is less accommodating to Holliday's position.

The First Circuit's decision in United States v. Harotunian, 920 F.2d 1040, 1044 (1st Cir. 1990), fairly frames the inquiry as a species of "diminished capacity" claim:

> With respect to diminished capacity, the court reasoned that, even if appellant did suffer from a gambling addiction (a diagnosis that the court viewed skeptically),

4

>the guidelines' general purpose of deterrence would be ill served by discounting appellant's sentence on this basis. After all, the court noted, such a dependence would be akin to drug or alcohol addiction--considerations to which the Sentencing Commission assigned little weight. *See, e.g.,* U.S.S.G. § 5H1.4; *see also United States v. Williams,* 891 F.2d 962, 965 (1st Cir.1989) (drug addiction not a proper basis for downward departure). Mindful of the deferential treatment which these kinds of judgments deserve, *Diaz-Villafane,* 874 F.2d at 52, we are unprepared to say that the court's decision to downplay appellant's claim of diminished capacity was unreasonable.

United States v. Harotunian, 920 F.2d 1040, 1046 -1047 (1st Cir. 1990).

Somewhat more recent are Judge Gertner's remarks in United States v. Iaconetti, 59 F. Supp. 2d 139 (D. Mass. 1999), in which she suggested, in dictum, that sentencing courts have authority to consider compulsive gambling as grounds for a downward departure. In Judge Gertner's view, however, the threshold is high indeed:

>For a claim of diminished capacity, attributable to compulsive gambling, to succeed, the defendant must show: 1) that he suffered from a pathological gambling disorder which 2) resulted in a significantly reduced mental capacity 3) causally connected to the commission of the charged offenses.

United States v. Iaconetti, 59 F.Supp.2d 139, 146 (D.Mass.,1999) (citing United States v. Harris, 1994 WL 683429, *1 (S.D.N.Y.), aff'd, 79 F.3d 223 (2nd Cir. 1996).

Mr. Holliday perpetrated a carefully orchestrated fraud scheme, using numerous intermediaries (including subordinates, a fellow-gambler and third-party vendors) to accomplish his criminal ends, over an extended period (from November 2000 through January 2002). These circumstances belie any suggestion that Holliday's crime was the product of diminished capacity. Mr. Holliday's submissions regarding his psychological background may assist in understanding the road by which he came to commit his crime, but they do not significantly reduce his culpability.

5

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | MICHAEL J. SULLIVAN<br>United States Attorney |
| dated:  October 26, 2005 |  |
|  | By: /s/ Paul G. Levenson<br>PAUL G. LEVENSON<br>Assistant U.S. Attorney<br>John Joseph Moakley United States Courthouse<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3147 |